**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

BRIDGEFIELD CASUALTY INSURANCE COMPANY,

Plaintiff,

v. Case No: 8:23-cv-2465-CEH-LSG

THE CINCINNATI INSURANCE COMPANY,

Defendant.

---

**ORDER**

In this insurance dispute, Plaintiff Bridgefield Casualty Insurance Company sues Defendant The Cincinnati Insurance Company for equitable subrogation and equitable contribution. Pending before the Court are the parties' cross motions: Plaintiff Bridgefield Casualty Insurance Company's Motion for Summary Judgment (Doc. 142) and Defendant The Cincinnati Insurance Company's Motion for Final Summary Judgment (Doc. 143). The parties filed responses in opposition (Docs. 154, 155) and replies (Docs. 157, 158). Upon due consideration of the parties' submissions, including the Stipulation of Agreed Material Facts (Doc. 160), deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, Cincinnati Insurance Company's Motion for Final Summary Judgment (Doc.

143) will be granted, and Bridgefield Casualty Insurance Company's Motion for Summary Judgment (Doc. 142) will be denied.

## I. BACKGROUND AND FACTS[1]

### A. Stipulated Facts

This action arises from a personal injury claim and underlying lawsuit (the "underlying lawsuit") following an accident at a construction site on December 12, 2019, in which Jasmine Juarez was injured. Doc. 160 ¶ 1. On that date, Ms. Juarez was an employee of Juarez Concrete Solutions Corporation ("Juarez Concrete"). *Id.* ¶ 2. Juarez Concrete was a subcontractor of C-Squared Certified General Contractor, Inc. ("C-Squared") for an intersection improvement project in Charlotte County, Florida (the "Project"). *Id.* The subcontract is dated July 12, 2019. *See* Doc. 145-7.

C-Squared was the general contractor on the Project. *Id.*; *see also* Doc. 160 ¶ 3. While delivering concrete to one of the Project's job sites, Ms. Juarez was injured when a Caterpillar Track Loader (the "Loader") operated by John Yoho, a C-Squared employee working in the course and scope of his employment, collided with her. Doc. 160 ¶ 4. Ms. Juarez was working in the course and scope of her employment with Juarez Concrete at the time of the accident. *Id.*

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Stipulation of Agreed Material Facts (Doc. 160). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

On December 12, 2019, C-Squared was the named insured under insurance policies issued by Cincinnati (the "Cincinnati Policy") and Bridgefield (the "Bridgefield Policy"). Doc. 160 ¶ 5. On the date of the accident, the Cincinnati Policy included coverage under a commercial general liability part and a commercial auto part. *Id.* ¶ 6. There is a dispute between the parties as to whether the umbrella coverage part of the Cincinnati Policy was in effect on the date of the accident. *Id.* The parties have filed a copy of the Cincinnati Policy. *See* Docs. 142-1; 155-1; 145-2.

Cincinnati contends that, on February 19, 2019, C-Squared requested cancellation of the umbrella coverage part of the Cincinnati Policy, which was effectuated as of that same date. Doc. 160 ¶ 7. Cincinnati's responses to requests for admission served in January 2025 admitted that an umbrella policy was issued to C-Squared bearing policy number ENP 051 26 42/EBA 0512642 with a policy period of January 1, 2019 to January 1, 2020, and that the umbrella policy generally provided excess/umbrella coverage to C-Squared pursuant to the terms and conditions of the policy. *Id.* Cincinnati, in its December 23, 2019 reservation of rights letter, referenced "pertinent sections" of the umbrella policy and did not reference any cancellation or cancellation provision. *Id.* The Settlement Agreement, to which Cincinnati was not a party, but which Cincinnati reviewed and provided comments on, states in ¶ 10 that Cincinnati issued commercial general and umbrella liability insurance policies to C-Squared that were in effect on the accident date. *Id.*

The Bridgefield Policy contains workers' compensation and employer's liability coverage parts. Doc. 160 ¶ 8. The parties have filed copies of the Bridgefield Policy. *See* Docs. 142-2; 145-1.

C-Squared is a Florida company subject to the provisions of Florida Statutes, Title XXXI, Chapter 440, including Florida Statutes 440.10 and 440.11. Doc. 160 ¶ 9. Messrs. Yoho and Floyd are not employers of Ms. Juarez. *Id.* ¶ 10.

Cincinnati received notice of the accident on the date it happened—December 12, 2019. *Id.* ¶ 11; *see also* Doc. 145-8. On December 23, 2019, Cincinnati issued a reservation of rights letter to C-Squared. Doc. 160 ¶ 12; Docs. 142-4; 145-9. Around March 2020, Cincinnati assigned William Boltrek as defense counsel on behalf of C-Squared, Mr. John Yoho, and Mr. Larry Floyd. Doc. 160 ¶ 13. Mr. Boltrek was later replaced by attorney Michael Reed, who filed an appearance on behalf of all three defendants (C-Squared, Yoho, and Floyd) in the underlying lawsuit. *Id.*; *see also* Doc. 142-5 (Cincinnati's claim notes between December 2019 and September 2020).

On September 2, 2020, Ms. Juarez made a time-limit settlement demand of $1 million to resolve her claims against C-Squared and its employees via letter to Mr. Boltrek (the "Demand"). Doc. 160 ¶ 14; Doc. 145-10 at 2–3. The Demand was supplemented on September 22, 2020, with additional damage and investigation information. Doc. 160 ¶ 14; Doc. 145-10 at 4–5. On September 24, 2020, Cincinnati's coverage counsel, David Glenny, provided a copy of the Demand to Bridgefield via letter. Doc. 160 ¶ 15; Doc 142-3; Doc. 145-11.

Bridgefield takes the position that Cincinnati was obligated to accept the Demand because C-Squared was immune to the vicarious liability claim against it under Florida Statutes § 440.11; Bridgefield did not insure Messrs. Yoho and Floyd; and Messrs. Yoho and Floyd are not employers of Ms. Juarez. Doc. 160 ¶ 16. Cincinnati contends Bridgefield was obligated to accept the Demand because Ms. Juarez was a statutory employee of C-Squared and the claims against C-Squared were barred by the employers' liability exclusion(s) in Cincinnati's policy. *Id.*

On September 25, 2020, Mr. Boltrek informed counsel for Ms. Juarez via letter that Cincinnati's coverage counsel stated "that there is no coverage for the incident under the Commercial General Liability Policy." Doc. 160 ¶ 17; Doc. 145-12. On September 29, 2020, Cincinnati declined Ms. Juarez's Demand via letter to counsel for Ms. Juarez. Doc. 160 ¶ 18; Doc. 142-6; Doc. 145-13.

On October 14, 2020, Ms. Juarez filed the underlying lawsuit, asserting causes of action for: (1) gross negligence against John Yoho; (2) gross negligence against Larry Floyd; and (3) vicarious liability against C-Squared. Doc. 160 ¶ 19; Docs. 142-7; 145-5 (Juarez Complaint). On October 14, 2020, Bridgefield denied C-Squared's demand for defense and indemnity for Ms. Juarez's claim under the Bridgefield Policy, asserting, among other issues, that Ms. Juarez was not an employee of C-Squared. Doc. 160 ¶ 20; Doc. 145-14 (denial letter). On October 22, 2020, C-Squared renewed its request for defense and indemnity under the Bridgefield Policy via letter from Mr. Reed. Doc. 160 ¶ 21; Doc. 145-15. On October 28, 2020, Bridgefield again denied

coverage for Ms. Juarez's claim under the Bridgefield Policy. Doc. 160 ¶ 22; Doc. 145-16.

On February 1, 2021, C-Squared, Mr. Yoho, and Mr. Floyd filed a joint answer in the underlying lawsuit. Doc. 160 ¶ 23. On February 3, 2021, Ms. Juarez and C-Squared entered a Settlement Agreement (the "Settlement Agreement" or "*Coblentz* Agreement).[2] Doc. 160 ¶ 24; Docs. 142-8; 155-6; 145-17. Cincinnati, through coverage counsel, provided comments and suggested edits to the Settlement Agreement before it was finalized. Doc. 160 ¶ 25; *see also* Docs. 142-9–142-11.

Bridgefield was not notified of the Settlement Agreement before it was finalized. Doc. 160 ¶ 26. The Settlement Agreement provides that the parties to the Settlement Agreement (Ms. Juarez and C-Squared) agreed that (i) if the $1,000,000.00 demand was promptly tendered by Bridgefield, Ms. Juarez would have accepted the same in exchange for a full release of C-Squared and Messrs. Yoho and Floyd; (ii) the "facts represented herein" were "intended to be truthful and that each party [wa]s relying on the statements made by the other party/parties to th[e] Agreement as inducement to resolve the claims"; (iii) "The Cincinnati Insurance Company . . . issued commercial

---

[2] The Settlement Agreement entered here is commonly referred to as a *Coblentz* Agreement, which refers to a settlement agreement entered into between an insured and a claimant in order to resolve a lawsuit in which the insurer has denied coverage and declined to defend. *Trovillion Constr. & Dev., Inc. v. Mid–Continent Cas. Co.*, No. 6:12–cv–914–Orl–RBD-TBS, 2014 WL 201678, at *3 n. 2. (M.D. Fla. Jan. 17, 2014) (citing *Coblentz v. Am. Sur. Co. of N.Y.*, 416 F.2d 1059 (5th Cir. 1969)). In a traditional *Coblentz* agreement, the insured enters into a consent judgment establishing its liability and fixing damages; and assigns any cause of action it has against its insurer to the claimant. *See id.*

general and umbrella insurance policies to C-Squared that were in effect at the time of the Collision" but "coverage under the policies issued by Cincinnati is unavailable"; (iv) if the stated facts in the Agreement were untrue, then the terms of the Agreement would be voidable. *Id.* ¶ 27. As required under Paragraph 2 of the Settlement Agreement, the parties to the Settlement Agreement arbitrated Ms. Juarez's damages before an arbitrator on February 4, 2021. *Id.* ¶ 28. On February 4, 2021, the arbitrator awarded Ms. Juarez $5,250,176.48. *Id.* ¶ 30; Doc. 145-19 (arbitration award). Although C-Squared's liability defenses were not considered at the arbitration, C-Squared disputed damages and cross-examined Ms. Juarez in the arbitration proceedings. Doc. 160 ¶ 29.

As required under Paragraph 4 of the Settlement Agreement, C-Squared assigned "all of its rights against Bridgefield" to Ms. Juarez via the Assignment Agreement (Doc. 145-20) dated February 15, 2021, in exchange for Ms. Juarez's agreement in the Settlement Agreement not to execute on the arbitration award, sue on it, record a judgment lien certificate, commence or prosecute any execution, levy, garnishment, attachment, proceedings supplementary or any other collection efforts or actions on the arbitration award against C-Squared, Yoho, and/or Floyd. Doc. 160 ¶ 31.

On February 22, 2021, the parties to the underlying lawsuit filed a Stipulation for Entry of Final Judgment and Order (Doc. 142-16) that (i) informed the trial court that the underlying lawsuit "has been amicably resolved by written settlement agreement and binding arbitration on damages"; (ii) requested that the trial court enter

Final Judgment in the amount of the arbitration award of $5,250,176.48 as "[p]art of the resolution of the case as to these Defendants"; and (iii) informed the trial court that "[a]nother part of the resolution of the case as to these Defendants is that the Plaintiff has agreed to withhold recording, execution and enforcement of the judgment against Defendants in exchange for an assignment of the Defendants' rights against Bridgefield Casualty Company." Doc. 160 ¶ 32. A Final Judgment in the amount of the arbitration award of $5,250,176.48 was entered against C-Squared on February 25, 2021. *Id.* ¶ 33; Doc. 142-17.

On April 26, 2021, Ms. Juarez only in her capacity as assignee of C-Squared filed an amended complaint in the underlying lawsuit naming only Bridgefield as a defendant and asserting a claim against Bridgefield for breach of contract. Doc. 160 ¶ 34; Docs. 155-2; 145-21. On December 28, 2021, Ms. Juarez only in her capacity as assignee of C-Squared filed a Second Amended Complaint against Bridgefield and added a claim for bad faith, which was abated "pending a determination of coverage." Doc. 160 ¶ 35.

On December 12, 2022, Bridgefield moved for summary judgment (Doc. 145-22) on the breach of contract claim asserted by Ms. Juarez in her capacity as assignee of C-Squared in the underlying lawsuit. Doc. 160 ¶ 36. On February 7, 2023, the trial court in the underlying lawsuit issued an order denying Bridgefield's Motion for Final

Summary Judgment.[3] *Id.* ¶ 37; Docs. 155-3; 145-23. Bridgefield, C-Squared, and Ms. Juarez subsequently settled the breach of contract claim and entered into a General Release and Confidentiality Agreement effective on or around March 4, 2023 ("Release"). Doc. 160 ¶ 38; Doc. 155- 4; Doc. 145-24.

Pursuant to paragraph 3 of the Release and as a condition of settlement, the parties agreed to present an order vacating the prior order denying Bridgefield's Motion for Summary Judgment. Doc. 160 ¶ 39. On April 13, 2023, at the request of the parties, the trial court in the underlying lawsuit entered an Order Vacating Prior Order Denying Bridgefield Casualty Company's Motion for Final Summary Judgment. *Id.* ¶ 40; Doc. 154-2. Thereafter, Ms. Juarez as assignee of C-Squared filed a Notice of Voluntary Dismissal with Prejudice in the underlying lawsuit on May 4, 2023, providing notice "that this action is dismissed with prejudice as to all defendants." Doc. 160 ¶ 41.

Cincinnati served responses to Bridgefield's requests for admission in this action on January 27, 2025. *Id.* ¶ 42; Docs. 142-18; 154-1. Cincinnati served amended responses to Bridgefield's requests for admission on April 4, 2025, but did not make

---

[3] In its order, the trial court found that "Bridgefield owed a duty to defend C-Squared against Ms. Juarez's claims;" "Bridgefield owed a duty to indemnify C-Squared for the Final Judgment entered against it in the Underlying Lawsuit;" and "Bridgefield is not entitled to judgment as a matter of law regarding its Affirmative Defenses attacking the reasonableness of the Settlement Agreement, Arbitration Award, and resulting Final Judgment." Doc. 155-3 at 18. This order was subsequently vacated per the settlement agreement between Bridgefield, C-Squared, and Ms. Juarez. Doc. 155-4 ¶ 3.

any motion to do so pursuant to Rule 36. Doc. 160 ¶ 44. As such, Bridgefield disputes the effectiveness of the amended responses dated April 4, 2025.

B. Litigation

1. *Jasmine J. Juarez v. C-Squared Certified General Contractor, Inc.; John Yoho, and Larry Floyd*, Case No. 2020-CA-908, in the Circuit Court of the 20th Judicial Circuit in and for Charlotte County, Florida

In the Complaint filed by Ms. Juarez against C-Squared and its employees, she alleges a claim for vicarious liability against C-Squared for Yoho and Floyd's conduct and claims of gross negligence against the individuals for the incident that occurred December 12, 2019, that caused Ms. Juarez's personal injuries. C-Squared's insurer Cincinnati assumed the defense, under a reservation of rights, of C-Squared and its employees sued in the action. Cincinnati's coverage counsel asserted there was no coverage available under Cincinnati's policies for the claims brought by Ms. Juarez. C-Squared's other insurer Bridgefield denied a defense or indemnification to C-Squared and its employees.

Cincinnati's retained counsel for C-Squared negotiated a settlement of the litigation in which a consent judgment was entered against C-Squared following a determination of Ms. Juarez's injuries through arbitration. Pursuant to the Settlement Agreement, Ms. Juarez agreed not to execute or seek to collect on the judgment against C-Squared or its employees in exchange for an assignment of C-Squared's rights against Bridgefield. Specifically, the Settlement Agreement provided:

> Juarez agrees and covenants not to record the arbitration award, sue on it, record a judgment lien certificate, commence or prosecute any execution, levy, garnishment,

> attachment, proceedings supplementary or any other collection efforts or actions on the arbitration award against C-Squared or any of its employees, officers or directors, including but not limited to Yoho and Floyd, or against Cincinnati.

Doc. 145-17 at 5.

2. *Jasmine J. Juarez, as assignee of C-Squared Certified General Contractor, Inc. v. Bridgefield Casualty Insurance Company*, Case No. 2020-CA-908, in the Circuit Court of the 20th Judicial Circuit in and for Charlotte County, Florida

After entering into the Settlement Agreement and armed with her assignment of rights, Juarez, standing in the shoes of C-Squared, amended her complaint to assert a single claim for breach of contract against Bridgefield only. The lawsuit alleged that Bridgefield improperly denied coverage and refused to defend C-Squared for the bodily injury claim brought against it by a statutory employee. The amended complaint sought consequential damages arising from the breach, including the amount of the Arbitration award. Ms. Juarez filed a Second Amended Complaint asserting a bad faith claim against Bridgefield, which was abated pending a ruling on the breach of contract claim. Bridgefield filed a motion for summary judgment arguing it owed no duty to defend or indemnify and did not breach its contract with its insured. The state court judge rejected Bridgefield's arguments and denied the motion although the motion was subsequently vacated per agreement of the parties.

Thereafter, Bridgefield entered into a confidential settlement with Ms. Juarez settling the breach of contract claim alleged in her Amended Complaint. The General

Release and Confidentiality Agreement included a release of Bridgefield by C-Squared and by Ms. Juarez from:

> all claims, counterclaims, causes of action, suits, damages, expenses, liabilities and demands of any kind whatsoever in law or in equity, regardless of whether known or unknown, asserted or un-asserted, liquidated or un-liquidated, accrued or un-accrued, matured or not yet matured, contingent or vested, whether in contract or tort, whether arising by statute, under the common law, or in equity, or under any other theory, of any nature whatsoever, arising at any time through and including the date of this Agreement to include, without limitation, all claims for coverage, bad faith, or attorneys' fees arising in any part out of the facts and circumstances alleged within any of the pleadings in the lawsuit currently styled *Jasmine J. Juarez v. Bridgefield Casualty Insurance Company*, Case No. 2020-CA-000908.

Doc. 145-24 at 2.

3. *Bridgefield Casualty insurance Company v. The Cincinnati Insurance Company*, Case No. 8:23-cv-2465-CEH-LSG, in the United States District Court for the Middle District of Florida

After settling the breach of contract claim with Ms. Juarez, as assignee of C-Squared, Bridgefield brought the instant action against Cincinnati for equitable subrogation and equitable contribution. In its complaint, Bridgefield alleges it did not owe any of the underlying personal injury damages but settled with Ms. Juarez in order to protect its insured C-Squared. Alternatively, Bridgefield argues that even if it owed a portion of the underlying settlement, it paid more than its pro rata share and therefore should be able to recover from C-Squared's co-insurer, Cincinnati, who Bridgefield contends should have indemnified C-Squared for Ms. Juarez's damages.

C. The Parties' Motions

1. Bridgefield's Motion for Summary Judgment (Doc. 142)

Bridgefield moves for summary judgment on both counts of its Complaint arguing that Cincinnati, not Bridgefield, is the entity responsible for the settlement of the underlying tort suit filed by Ms. Juarez against the parties' mutual insured, C-Squared. In its equitable subrogation claim, Bridgefield seeks reimbursement from Cincinnati for the full amount of the settlement it paid to Ms. Juarez. Bridgefield contends that its employer liability coverage does not apply because Ms. Juarez's gross negligence claims against Messrs. Yoho and Floyd fell within an exception to the workers' compensation immunity statute. Alternatively, in its contribution claim, Bridgefield seeks reimbursement for the amount it paid above its pro rata share. Even if Bridgefield owes a portion of the settlement, Bridgefield claims that Cincinnati owes two-thirds of the amount Bridgefield paid on the underlying claim because: (1) Cincinnati's CGL policy applies; (2) Cincinnati's business auto coverage applies; (3) Cincinnati's commercial umbrella coverage applies; and (4) the employer's liability exclusion in the Cincinnati Policy does not apply to covered employees.

Bridgefield argues that Cincinnati denied coverage for the only viable claims that Ms. Juarez had, which was against the individual employees, and then Cincinnati improperly shifted obligations to Bridgefield through the *Coblentz* agreement. Bridgefield contends it was forced to step in and resolve the judgment against C-Squared through payment of the settlement amount, which Bridgefield argues it is

entitled to recover from Cincinnati through equitable subrogation or equitable contribution.

2. Cincinnati's Motion for Summary Judgment (Doc. 143)

Cincinnati moved for summary judgment in its favor arguing that Bridgefield cannot recover on its equitable subrogation claim for payments Bridgefield made to resolve its own bad faith actions. Contrary to Bridgefield's representations that its settlement payment was made on behalf of C-Squared for damages owed to Ms. Juarez, Cincinnati argues that the settlement payment was made on behalf of Bridgefield for damages it owed to C-Squared due to its own breach of its insuring agreement. Cincinnati cites to Ms. Juarez's Amended Complaint to argue that Bridgefield was not paying money to Ms. Juarez individually for her injuries, as her injuries were not the subject of the Amended Complaint. Instead, Bridgefield's payment was to Ms. Juarez, as assignee of C-Squared, in satisfaction of the claim against Bridgefield for breaching its contract with its insured.

Additionally, Cincinnati contends that the contribution claim also fails because the settlement amount paid by Bridgefield was to satisfy Bridgefield's own obligation to its insured and Cincinnati was not a joint obligor for Bridgefield's breach of its insurance policy. Cincinnati argues that Bridgefield is trying to position itself as the carrier who stepped up and undertook the duty to defend and indemnify, which was not the case. Rather, it was Cincinnati who accepted the duty to defend, pursuant to a reservation of rights, and negotiated a settlement where neither C-Squared, nor its employees, would be exposed to payment of a judgment. Thus, Cincinnati argues that

payments by Bridgefield were made solely for its own benefit for Bridgefield's breach of contract and were not paid on behalf of C-Squared who, pursuant to the Settlement Agreement, would never owe money to Ms. Juarez.

Cincinnati next argues that Bridgefield cannot prevail on its claims because Cincinnati is the one who made a payment greater than its obligation by undertaking the expense of C-Squared's defense in the underlying litigation while Bridgefield refused to defend or indemnify. Therefore, Bridgefield cannot show it made a payment on behalf of its insured where the only payment made was in satisfaction of its breach of contract in failing to defend or indemnify.

Cincinnati submits that none of its policies provided coverage to C-Squared. The umbrella policy had been cancelled ten months before the accident happened. As for the CGL Policy, it contained a standard workers' compensation and employer's liability exclusion, which precluded coverage for injuries to an employee, such as Ms. Juarez who was considered a statutory employee. Finally, the Cincinnati auto policy did not provide coverage because the accident did not involve a "covered auto."

Finally, Cincinnati argues that Bridgefield's action here is an attempt to relitigate the issue of coverage, which was already decided by the state court. Notwithstanding that Bridgefield negotiated for the underlying summary judgment order to be vacated, Cincinnati argues that the state court still denied summary judgment and that decision was never reversed.

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III. DISCUSSION

### A. Equitable Subrogation

In Count I of its Complaint, Bridgefield sues Cincinnati for equitable subrogation alleging that it settled the underlying lawsuit to protect its own interests and to obtain a satisfaction of judgment in favor of C-Squared (Bridgefield and Cincinnati's mutual insured). Doc. 1 at 7–8. Bridgefield asserts that Cincinnati acted only in its own best interests by allowing a multi-million-dollar judgment to be entered against their joint insured C-Squared and in not providing any substantive defense to Ms. Juarez's claims in arbitration. Bridgefield contends it was not acting as a volunteer

when it agreed to the settlement but was paying the settlement to resolve the underlying lawsuit and obtain a satisfaction of judgment for its insured. Bridgefield seeks subrogation against Cincinnati for the settlement payment it made. In support of its entitlement to reimbursement, Bridgefield argues that Cincinnati's policies provide coverage and its policy does not.

Cincinnati responds that Bridgefield may not assert a claim for equitable subrogation because the payment Bridgefield made was not made on behalf of C-Squared. Rather, Bridgefield's payment was to Ms. Juarez, who was standing in C-Squared's shoes. It follows, Cincinnati argues, that Bridgefield cannot subrogate a claim on behalf of C-Squared for a settlement paid due to its own breach of its insuring agreement.

Under Florida law, "[s]ubrogation is the substitution of one person in the place of another with reference to a lawful claim or right." *W. Am. Ins. Co. v. Yellow Cab Co. of Orlando*, 495 So. 2d 204, 206 (Fla. 5th DCA 1986) (quoting *Boley v. Daniel*, 72 So. 644, 645 (Fla. 1916)). In relation to insurance, "[s]ubrogation is the right of the insurer to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss paid by the insurer." *Monte De Oca v. State Farm Fire & Cas. Co.*, 897 So. 2d 471, 472 n.2 (Fla. 3d DCA 2004) (citation omitted).

Florida courts recognize "two types of subrogation: conventional subrogation and equitable or legal subrogation." *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 646 (Fla. 1999). Equitable subrogation, which is at issue here, is a doctrine in equity that "is not created by a contract but by the legal consequences of the acts

and relationships of the parties." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 18 So. 3d 1099, 1100 (Fla. 2d DCA 2009) (citing *Dade Cnty. Sch. Bd.*, 731 So. 2d at 646); *see also W. Am. Ins.*, 495 So. 2d at 207. As an equitable remedy, equitable subrogation is broadly applied by Florida courts "in almost every conceivable type of transaction where the party invoking the doctrine has been required to pay a debt for which another is primarily answerable[.]" *Amegy Bank Nat'l Ass'n v. Deutsche Bank Corp.*, 917 F. Supp. 2d 1228, 1233 (M.D. Fla. 2013) (quoting *Rebozo v. Royal Indem. Co.*, 369 So. 2d 644, 646 (Fla. 3d DCA 1979)).

To maintain an action for equitable subrogation under Florida law, a party must prove five elements: "(1) that it made the payment at issue to protect its own interests, (2) the payment was non-voluntary, (3) it was not primarily liable for the debt paid, (4) it paid the entire debt, and (5) subrogation would not work any injustice to the rights of a third party." *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1005 (11th Cir. 2004) (citing *Dade County Sch. Bd.*, 731 So. 2d at 646). Although Bridgefield must prove these five elements in order to prevail on its equitable subrogation claim, it neither addresses nor argues these elements in its motion.[4] *See* Doc. 142.

---

[4] Instead, Bridgefield merely cites to *Silveri v. N. Ins. Co. of New York*, No. 09-CIV-61753, 2010 WL 11505223, at *4 (S.D. Fla. July 12, 2010), which identifies the five elements, but is factually inapposite. In *Silveri*, the insurer Northern Insurance Company paid its insureds (the Camposes) for damages to the insureds' vessel that resulted from a collision caused by the Silveris' vessel. The Silveris admitted fault and filed an action to interplead $105,836.59 in settlement proceeds into the court as they were uncertain to whom the money should be paid. The Camposes claimed they were entitled to the money. Through equitable subrogation, the insurer sought the money since the insurer had already paid the Camposes $101,836.69 (an amount determined in arbitration) for the vessel's damage. While the insurer waived its right

Here, Bridgefield can establish the first two elements. It made the payment to protect its own interests. By entering into the settlement with Ms. Juarez, Bridgefield obtained a release for itself. *See* Doc. 145-24. The payment Bridgefield made was not as a volunteer. Rather, it made the payment specifically to obtain a release from any and all claims that could be asserted by C-Squared and/or Ms. Juarez against Bridgefield. Bridgefield argues that it paid to resolve Ms. Juarez's claims subject to its right to seek reimbursement from Cincinnati.[5] Doc. 157 at 2. In support it cites *Frank Briscoe Co. v. Georgia Sprinkler Co.*, 713 F.2d 1500, 1502 (11th Cir. 1983), for the proposition that an insurer may pursue through subrogation for a loss suffered by its insured which was occasioned by the negligence of a third party. However, Bridgefield did not make a payment to its insured for damages suffered by it due to a negligent third party.

Bridgefield cannot satisfy the third element because it cannot establish that it was not the one primarily liable for the debt. "As a result of equitable subrogation, the party discharging the debt stands in the shoes of the person whose claims have been discharged and thus succeeds to the right and priorities of the original creditor." *Dade*

---

to contractual subrogation by virtue of entering into a Policy Release with the payment of the $101,836.69, the court concluded the insurer was still able to pursue an equitable subrogation claim against its insureds to avoid the insureds from obtaining what in essence would be a double recovery for their damages. Unlike Bridgefield's denial of defense and indemnity in the instance case, Northern Insurance Company paid the settlement amount to its insured pursuant to its policy of insurance. Moreover, there is no issue of potential double recovery here.

[5] That condition does not appear in the Juarez/Bridgefield settlement agreement.

*Cnty. Sch. Bd.*, 731 So. 2d at 646. It is unclear in whose shoes Bridgefield claims to be standing. Fatal to Bridgefield's claim is that subrogation is unavailable "to a party who pays his own debt." *Nova Info. Sys., Inc.*, 365 F.3d at 1005 (citing *In re Munzenrieder Corp.*, 58 B.R. 228, 231 (Bankr. M.D. Fla. 1986)). Bridgefield argues that it settled with Ms. Juarez to obtain a satisfaction of judgment for C-Squared, but Ms. Juarez had already agreed not to execute on the judgment against C-Squared, its employees, or against Cincinnati. Doc. 145-17 at 4 (¶ 19), 5 (¶ 4).

Bridgefield also argues that it made the payment on behalf of C-Squared and is therefore subrogated to C-Squared's indemnity rights against its tortfeasor employees, Messrs. Yoho and Floyd. This argument fails as well. First, this lawsuit is not brought by Bridgefield against Floyd and Yoho. Second, the underlying breach of contract claim was brought by Ms. Juarez, as assignee of C-Squared's rights, and Bridgefield's settlement of that breach of contract claim did not bestow upon it rights from C-Squared. Rather, Bridgefield paid to satisfy its own breach of duties owed to C-Squared. In that regard, the claim that was asserted against Bridgefield was for Bridgefield's breach of contract in failing to defend C-Squared in the underlying lawsuit. Ms. Juarez brought the claim, not in an individual capacity for her personal injuries, but instead as an assignee of C-Squared's rights against its insurer. Ms. Juarez's Amended Complaint alleges that "Bridgefield breached its duties under the Policy by refusing to defend or indemnify C-Squared against Ms. Juarez's claim." Doc. 155-2 ¶ 30. Although Bridgefield argues that it was required to pay a debt that Cincinnati was primarily required to pay, the record does not support this argument

and Bridgefield fails to explain how Cincinnati is responsible for Bridgefield's breach of its duty to defend. The settlement payment made by Bridgefield was in settlement of its own breach of duties it owed pursuant to its policy with its insured C-Squared, *i.e.*, the payment was made by Bridgefield to satisfy its own debt. Because Bridgefield may not subrogate for its own debt, its equitable subrogation claim fails. Cincinnati is entitled to judgment in its favor as to the equitable subrogation claim in Count I of the Complaint.

**B. Equitable Contribution**

In Count II of its Complaint, Bridgefield sues Cincinnati for equitable contribution. Doc. 1 at 8–9. Bridgefield claims that Cincinnati and it shared a common obligation to their mutual insured, C-Squared, and that Ms. Juarez's claims were covered by policies issued by both insurers. Because Bridgefield paid the full amount of the settlement to resolve Ms. Juarez's claims against C-Squared and because Cincinnati did not pay anything toward the settlement, Bridgefield argues its payment exceeded its pro rata share of the indemnity obligations owed on behalf of C-Squared. Thus, Bridgefield seeks contribution from Cincinnati for Cincinnati's share of the settlement Bridgefield paid. Cincinnati argues that Bridgefield's subrogation claim fails because it cannot establish that Cincinnati was a joint obligor for Bridgefield's breach of contract.

The doctrine of equitable contribution "attempts to distribute equally among those who have a common obligation, the burden of performing that obligation." *Nova Info. Sys.*, 365 F.3d at 1006 (quoting *Fletcher v. Anderson*, 616 So. 2d 1201, 1202 (Fla.

2d DCA 1993)). When a party has paid in excess of its pro rata share of the obligation, it is entitled by law to contribution from the other parties for their share. *Fletcher*, 616 So. 2d at 1202. Bridgefield maintains that it and Cincinnati had a "common obligation" to indemnify C-Squared for the damages claimed by Ms. Juarez. Bridgefield's argument is unavailing. Bridgefield cannot obtain contribution from Cincinnati here because the settlement payment Bridgefield made, for which it seeks contribution, was for its own breach of contract. Doc. 145-24.

C-Squared, the insured, and its employees, including Yoho and Floyd, along with Cincinnati, were released by Ms. Juarez in the underlying Settlement Agreement negotiated by C-Squared's counsel. Cincinnati argues that Bridgefield cannot show that its payment to Ms. Juarez was made on Cincinnati's behalf or on behalf of their mutual insured C-Squared and its employees, Yoho and Floyd, and therefore no "shared" obligation existed between the insurers.

In the Amended Complaint, Ms. Juarez named only Bridgefield as a defendant. As assignee of C-Squared, she sued Bridgefield for breaching its policy of insurance issued to C-Squared by refusing to defend or indemnify C-Squared against Ms. Juarez's claim. Doc. 145-21. Although the order denying Bridgefield's summary judgment on the breach of contract claim was vacated, the breach of contract case was ultimately settled. Bridgefield is correct that the vacated order would have no *res judicata* effect. The Eleventh Circuit has repeatedly held that a vacated opinion or order is "officially gone" and therefore cannot provide a basis for *res judicata*. *Zuniga v. Comm'r of Soc. Sec.*, 772 F. App'x 870, 871 (11th Cir. 2019) (citing *United States v. Sigma*

*Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002). Nevertheless, in settling the breach of contract action, Bridgefield extinguished a debt it owed for, among other things, its failure to defend and indemnify its insured C-Squared. Bridgefield can point to no evidence in the record to show that Cincinnati was obligated to pay for or contribute to the payment for Bridgefield's breach of its duties under its policy of insurance with C-Squared. As Cincinnati points out, only Cincinnati retained a lawyer for C-Squared and paid for C-Squared's defense. Bridgefield did not. Instead, Bridgefield denied C-Squared and its employees a defense or indemnity. Cincinnati, not Bridgefield, was the one that negotiated a settlement that resolved the claims against C-Squared and its employees such that no judgment could be enforced against C-Squared or its employees.

Bridgefield argues that Yoho and Floyd did not release Cincinnati for their claims, but Bridgefield's argument misses the mark. Yoho and Floyd were released by Juarez who was the one who sued them for their negligence. As a result of the Settlement Agreement, Yoho and Floyd were no longer exposed to personal liability, nor was C-Squared exposed to vicarious liability for their alleged conduct. Bridgefield's settlement of its breach of contract claim was not an obligation owed by Cincinnati. Because no "common obligation" existed between Bridgefield and Cincinnati as it relates to the settled breach of contract claim, Bridgefield's equitable contribution claim fails.

### C. No Coverage Under Cincinnati's Policies of insurance

In the insurance context, whether there is a common obligation for purposes of an equitable contribution claim is generally a question of coverage. *Hiscox Ins. Co. Inc. v. Watford Specialty Ins. Co*., 647 F. Supp. 3d 1318, 1321 (S.D. Fla. 2022). (citing *Cincinnati Specialty Underwriters Ins. Co. v. KNS Grp*., LLC, 561 F. Supp. 3d 1298, 1316 (S.D. Fla. 2021) (denying claim for equitable contribution after finding an absence of coverage). This case, however, comes before the Court in an unique procedural posture. It is not before the Court in the typical fashion wherein an insurer is uncertain as to its rights and responsibilities under a policy of insurance and seeks a declaratory judgment. And, notwithstanding the *Coblentz* Agreement consummated by Ms. Juarez and C-Squared, this action is not before the Court to challenge the validity of the consent judgment entered below that was based on that Agreement. Instead, this case comes to the Court following the settlement of the breach of contract claim for Bridgefield's failure to defend and indemnify C-Squared. For the reasons discussed above, Bridgefield's payment to Ms. Juarez, as assignee of C-Squared, for its breach of its duty to defend was not a payment that Cincinnati was primarily liable for, nor was it a shared obligation between Bridgefield and Cincinnati. Even if the Court were to consider the availability of coverage, Bridgefield's claims still fail because no coverage exists under Cincinnati's policies of insurance.

1. The Umbrella Policy

Despite the extensive and convoluted course of discovery related to Cincinnati's umbrella policy,[6] it is undisputed that the umbrella policy was cancelled ten months before this accident happened, specifically on February 19, 2019, at the request of the agent Atlas. *See* Doc. 145-27; *see also* Doc. 145-2 at 363-366. Bridgefield denies knowledge of the cancellation until recently, but it was provided copies of the cancellation endorsement multiple times, before and after this action was filed. Bridgefield argues that Cincinnati's admission that the umbrella policy was in effect binds Cincinnati to that admission and waives Cincinnati's right to deny the existence of coverage. Doc. 142 at 22. Bridgefield does not cite any legal authority for this proposition. Further, in Cincinnati's "admission" which Bridgefield relies on (Doc. 142-18 at 3-4), Cincinnati indicates that the umbrella policy (and the CGL policy) do not afford coverage. *Id.* at 4. And while the admission response also indicates that the policy was issued with a policy period of January 1, 2019 through January 1, 2020, the response does not go so far as to state that the policy was in effect during that entire period. Indeed, the record reflects that Cincinnati has consistently taken the position

[6] In its May 5, 2026 order denying Bridgefield's motion to amend, this Court summarized the dispute. *See* Doc. 173 at 5-7. In sum, Bridgefield contended Cincinnati misrepresented that the umbrella policy was in effect throughout the course of the underlying proceedings and this litigation up until April 2025 at which time it purportedly changed its position to argue the policy had been cancelled. As discussed in the Court's order, however, the record evidence shows that Bridgefield was provided with the umbrella cancellation endorsement prior to initiating this litigation and again in discovery produced in May 2024. A complete copy of the policy, including cancellation endorsements, was again provided to Bridgefield in December 2024.

before and throughout this litigation that the umbrella policy does not apply.[7] As noted, Bridgefield was provided copies of the cancellation endorsement on multiple occasions. Given the undisputed record evidence that the umbrella policy was cancelled before Ms. Juarez's accident, the umbrella policy would not provide coverage for the incident.

2. The Auto Policy

Bridgefield argues that Cincinnati's Commercial Auto Policy provides coverage because the Loader that backed into Ms. Juarez would be a "covered auto" under Cincinnati's Auto Policy.[8] Doc. 142 at 6, 13-14, 20-21. As a preliminary matter, it is clear that the Loader is not listed on the Schedule of Vehicles. *See* Doc. 155-1 at 587-592. Turning to Cincinnati's Auto Policy, it defines "Auto" as:

> 1. A land motor vehicle, "trailer" or semi-trailer designed for travel on public roads or
> 2. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.
>
> However, "auto" does not include "mobile equipment."

Doc. 155-1 at 604. Thus, Bridgefield claims that the "Loader" is either a "land motor vehicle" or it is an "other land vehicle that is subject to a compulsory or financial

---

[7] *See e.g.,* Doc. 145-9; Doc. 145-12.

[8] Cincinnati claims that coverage under the Auto Policy is a new argument raised by Bridgefield. Doc. 143 at 20. Nowhere in the Complaint does Plaintiff reference the auto portion of the Cincinnati Policy. *See* Doc. 1. Plaintiff cannot amend its complaint by arguments in its summary judgment briefing. *See, e.g., Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1338 (11th Cir. 2024); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (holding that a plaintiff may not "raise new claims at the summary judgment stage").

responsibility law or other motor vehicle insurance law where it is licensed or principally garaged." But the Policy specifically excludes "mobile equipment" from the definition of "auto."

Cincinnati responds that Caterpillar Track Loader at issue would be considered "mobile equipment," under the policy. In pertinent part, "mobile equipment" means any of the following land vehicles, including any attached machinery or equipment:

> 1. Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads; . . .
> …
> 3. Vehicles that travel on crawler treads.

Doc. 155-1 at 605.

Cincinnati submits that the Loader is "mobile equipment" as it was made for use principally off public roads. It argues that Bridgefield proffers no evidence to suggest otherwise. While neither party directs the Court to any deposition testimony that discusses the Loader in detail, there are photographs of the Loader in the record. *See* Doc. 142-7 at 4, 6. It is obvious from review of the photographs that the equipment at issue had crawler treads and was designed for off-road use. As indicated above, the policy states: "'auto' does not include 'mobile equipment.'" Doc. 155-1 at 604. As the Loader would be mobile equipment, it is not a covered auto under the policy.

Alternatively, because C-Squared is a licensed contractor, Bridgefield contends that C-Squared was obligated to comply with the financial responsibility law that requires insurance. In support, Bridgefield cites to Florida Administrative Code 61G4-15.003, which requires a general contractor to "submit a signed affidavit attesting to

the fact that the applicant has obtained and will maintain public liability and property damage insurance, in the amounts stated . . . for the life of an active certificate or registration and for the safety and welfare of the public." Fla. Admin. Code Ann. R. 61G4-15.003(1). Bridgefield's argument is unpersuasive. While it is true that as a general contractor, C-Squared was required to carry general liability insurance, that is not the same, however, as requiring every piece of equipment to be listed as a covered auto. If that were the case, there would be no "mobile equipment" exception. Bridgefield fails to establish Cincinnati's auto policy provides coverage for the incident.

3. The CGL Policy

Cincinnati argues that its CGL Policy does not provide coverage due to workers' compensation immunity and the standard workers' compensation and employer's liability exclusions contained in its policy which preclude coverage for injury to an employee. In relevant part, the Cincinnati CGL Policy includes the following exclusions:

> **2. Exclusions**
> …
> **d. Workers' Compensation and Similar Laws**
> Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.
> **e. Employer's Liability**
> Bodily injury to:
> (1) an "employee" of the insured sustained in the "workplace";
> (2) An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; …

Doc. 145-3 at 34. The Policy defines "employee" to include a "leased worker" but not a "temporary worker." *Id.* at 49. Bridgefield argues that Ms. Juarez would not qualify as a statutory employee of C-Squared. Additionally, Bridgefield argues that Ms. Juarez would be considered a "temporary worker" and therefore would not fall within the Policy's definition of "employee." Taking the second argument first, Bridgefield's argument is not persuasive. "Temporary worker" is defined in the Policy to mean "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." *Id.* at 52. There is no record evidence that Ms. Juarez was substituting for any absent C-Squared employee, was hired to meet seasonal work needs, or was employed for a short-term workload condition. Her involvement was as an employee of the subcontractor pursuant to the terms of the subcontract.

In response to Bridgefield's first argument, Cincinnati argues that Ms. Juarez would be a statutory employee of C-Squared such that the above Policy exclusions apply to her. The concept of a statutory employee under Florida law derives from Florida Statutes § 440.10(1)(b), which states:

> In case a contractor sublets any part or parts of his or her contract work to a subcontractor or subcontractors, all of the employees of such contractor and subcontractor or subcontractors engaged on such contract work shall be deemed to be employed in one and the same business or establishment, and the contractor shall be liable for, and shall secure, the payment of compensation to all such employees, except to employees of a subcontractor who has secured such payment.

The Court agrees that Ms. Juarez, as an employee of the subcontractor Juarez Concrete, was C-Squared's statutory employee, as contemplated by § 440.10(1)(b), while she was performing work at the C-Squared construction site. Under Florida law, "[s]tatutory employees have been treated identically to actual employees in relation to standard employee exclusion clauses." *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1322–23 (11th Cir. 2014) (quoting *Fla. Ins. Guar. Ass'n, Inc. v. Revoredo*, 698 So. 2d 890, 892 (Fla. 3d DCA 1997) (citing *Dodge v. Fid. & Cas. Co. of N.Y.*, 424 So.2d 39 (Fla. 5th DCA 1982) and *Michaels v. U.S. Fid. & Guar. Co.*, 129 So.2d 427 (Fla. 2d DCA 1961)). As explained by the Eleventh Circuit, "[u]nlike worker's compensation insurance or employer's liability insurance, which exist to provide employers with coverage for injuries that occur to employees during the scope of employment, the sole purpose of commercial general liability insurance is to provide coverage for injuries that occur to the public-at-large." *Amerisure Ins. Co. v. Orange & Blue Const., Inc.*, 545 F. App'x 851, 855 (11th Cir. 2013). Ms. Juarez was a not a member of the public at large; she was a subcontractor's employee working on C-Squared's project.

In response, Bridgefield argues that a district court opinion from the Southern District of Florida has rejected that a statutory employee automatically qualifies as an "employee" under the definition in the Cincinnati Policy. Doc. 142 at 5 (citing *Wellington Specialty Ins. Co. v. Serv.*, No. 08-22745-CIV, 2010 WL 11505215 (S.D. Fla. June 7, 2010), *aff'd sub nom. Wellington Specialty Ins. Co. v. Kendall Crane Serv.*, 434 F. App'x 794 (11th Cir. 2011)). The *Wellington* opinion is not binding on this Court, but even more perilous to Bridgefield's argument is that *Wellington* is factually

distinguishable and its analysis is inapposite. In *Wellington*, a subcontractor's employee injured another independent subcontractor's employee. In contrast, in the instant case, Ms. Juarez (a subcontractor's employee) was injured by employees of C-Squared (the general contractor). This distinction is material and significant. As the *Wellington* court pointed out, "[u]nder Florida's workers' compensation statutes, the concept of a 'statutory employer' is intertwined with the relationship between a general contractor and its subcontractors, or a subcontractor and its own subcontractors." *Id.* at *5. In *Wellington*, the subcontractors were independent and unrelated. As noted by that court, it is "the act of subletting work that creates the statutory relationship, not the mere happenstance of working on the same construction site." *Id.* Here, the statutory relationship was created. C-Squared, as the general contractor, was responsible for employees on the job site, including subcontractor employees such as Ms. Juarez. This general contractor/subcontractor relationship as it exists in the instant case (which was absent in *Wellington*) supports the purpose behind the rule that workers' compensation or workers' employee liability provides the coverage, not a CGL policy which is intended to protect the general public.

Florida courts "have consistently held that the term 'employee' in insurance policies also includes statutory employees." *Amerisure Ins. Co.*, 545 F. App'x at 854–55 (citing *Revoredo*, 698 So.2d at 892 and *Dodge*, 424 So. 2d at 40). Bridgefield fails to raise a genuine issue of material fact as to Ms. Juarez's status as a statutory employee of C-Squared. Because the employer's liability exclusion in the Cincinnati CGL policy applies to bar coverage to employees injured on the job and because Florida law treats

statutory and actual employees the same as it relates to standard employee exclusionary provisions, no coverage exists for Ms. Juarez under Cincinnati's CGL policy.[9]

**D. Duty to Defend and Indemnify Under Florida Law**

In Florida, an insurer's duty to defend is determined solely from the allegations in the claimant's complaint against the insured where suit has been filed. *Higgins v. State Farm Fire & Cas. Co*., 894 So. 2d 5, 10 (Fla. 2004). An insurer must defend its insured if the allegations could allow the insured to be covered by the insurance policy. *State Farm Mutual Auto. Ins. Co. v. Universal Atlas Cement Co*., 406 So. 2d 1184 (Fla. 1st DCA 1981). If the complaint alleges facts partially within and partially outside of an insurance policy's coverage, the insurer must still defend the entire suit. *Khatib v. Old Dominion Ins. Co*., 153 So. 3d 943, 947 (Fla. 1st DCA 2014) (citation omitted). Any doubt as to whether a duty to defend exists must be resolved in favor of the insured. *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co*., 470 So. 2d 810, 814 (Fla. 1st DCA 1985).

The duty to indemnify, however, is narrower than the duty to defend. *U.S. Fire Ins. Co. v. Hayden Bonded Storage C*o., 930 So. 2d 686, 691 (Fla. 4th DCA 2006) (citation omitted). While the duty to defend is triggered by the allegations in the complaint, the duty to indemnify is determined by the underlying facts developed through discovery

---

[9] Because no coverage exists under the Cincinnati policies, the Court need not analyze the availability of coverage under the Bridgefield policy. If Cincinnati's policies do not provide coverage, Bridgefield's claims of subrogation and/or contribution against Cincinnati necessarily fail.

or adduced at trial. *Id.* Under Florida law, an insurer who has the duty to defend its insured but refuses to do so, "cannot later challenge the reasonableness of the settlement . . . ." *Galen Health Care, Inc. v. Am. Cas. Co. of Reading, Pennsyl*vania, 913 F. Supp. 1525, 1533 (M.D. Fla. 1996) (citing *Florida Farm Bureau Mutual Ins. Co. v. Rice*, 393 So. 2d 552, 556 (Fla. 1st DCA 1980), *rev. denied*, 399 So. 2d 1142 (Fla. 1981) (insurer who refused to defend insured estopped from complaining about the reasonableness of consent judgment negotiated by insured's attorney and plaintiff without the insurer's participation). Where an insurer fails to assume its contractual obligations to provide a defense, it does so with full appreciation of the risk involved. *Fla. Farm Bureau*, 393 So. 2d at 556.

Bridgefield argues the "big lie" of the *Coblentz* Agreement is that it resolved claims against C-Squared although C-Squared was never exposed to a judgment. Doc. 142 at 24. However, Bridgefield cannot now be heard to complain about the *Coblentz* Agreement, the amount of the settlement, or the fact that Bridgefield was not told or consulted about the agreement where it refused to defend its insured and left its insured to its own devices to resolve the claims asserted against it.

Accordingly, it is

**ORDERED and ADJUDGED**:

1. Plaintiff Bridgefield Casualty Insurance Company's Motion for Summary Judgment (Doc. 142) is **denied**.

2. Defendant The Cincinnati Insurance Company's Motion for Final Summary Judgment (Doc. 143) is **granted**, as no genuine issues of material fact exist. Defendant The Cincinnati Insurance Company is entitled to a judgment in its favor as a matter of law.

3. The Clerk is directed to enter Judgment in favor of Defendant The Cincinnati Insurance Company and against the Plaintiff Bridgefield Casualty Insurance Company on Plaintiff's claims for equitable subrogation and equitable contribution.

4. The Clerk is further directed to terminate pending motions and deadlines and **close** this case.

**DONE** and **ORDERED** in Tampa, Florida on September 1, 2026.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties